UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICOLAS TEASDALE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CELADON GROUP, INC., BOBBY L. PEAVLER, and PAUL A. WILL,<br><br>Defendants. | No. 17-cv-3659<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nicolas Teasdale ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), conference call transcripts, news reports, press releases issued by Defendants, and other publicly available documents, as follows:

## NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Celadon Group, Inc. ("CGI" or the "Company") common stock between January 27, 2016 through May 2, 2017 inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. CGI, through its subsidiaries, provides long-haul, full-truckload freight service across the United States, Canada, and Mexico. The Company also provides supply chain

management solutions such as warehousing and dedicated fleet services, as well as freight brokerage services.

3. On April 5, 2017, the market research website *Seeking Alpha* published a detailed report authored by a Prescience Point Research Group ("Prescience Point"), entitled "Celadon Group: A Story That Ends At Chapter 11," which, among other things, alleged that "CGI has used …. manipulative accounting practices to hide its insolvent condition from investors and creditors."

4. On this news, CGI's share price fell nearly 14% to close at $5.40 on April 5, 2017.

5. On April 19, 2017, Prescience Point published another report entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," which reported that the research group was denied information about CGI sought under the Freedom of Information Act ("FOIA") due to an apparent ongoing SEC investigation.

6. On this news, CGI's share price fell nearly 5% to close at $4.20 on April 19, 2017.

7. On May 1, 2017, after trading had closed, CGI disclosed that its auditor had notified the Company that it was "withdrawing its reports on the June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon" due to issues relating to transactions involving "revenue equipment held for sale."

8. On May 2, 2017 CGI's shares plunged another 55% to close at $1.80 on May 2, 2017.

9. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i)CGI did not appropriately recognize revenue equipment held for sale in its financial reports; (ii) CGI's equity contribution to its joint venture with Element Financial Corp. was $68.2 million, rather than the $100 million contribution the Company reported in its public filings; (iii) CGI failed to maintain effective internal controls over financial reporting; (iv) the Company is being actively investigated by the SEC; and (v) that as a result of the foregoing, CGI's publicly disseminated financial statements were materially false and misleading.

**JURISDICTION AND VENUE**

10. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

12. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company's common stock trades on the New York Stock Exchange.

14. In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15. Plaintiff Nicolas Teasdale was a shareholder of CGI during the Class Period. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

16. Defendant Celadon Group, Inc. is a Delaware corporation with its principal place executive offices located at 9503 East 33rd Street, 1 Celadon Drive, Indianapolis, Indiana. CGI, through its subsidiaries, provides long-haul, full-truckload freight service across the United States, Canada, and Mexico. The Company also provides supply chain management solutions such as warehousing and dedicated fleet services, as well as freight brokerage services. The Company trades on the New York Stock Exchange under the ticker symbol "CGI."

17. Defendant Bobby L. Peavler ("Peavler") has served at all relevant times as CGI's Chief Financial Officer, Executive Vice President, and Treasurer.

18. Defendant Paul A. Will ("Will") has served at all relevant times as CGI's Chief Executive Officer.

19. Collectively, Peavler and Will are referred to throughout this complaint as the "Individual Defendants."

20. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports,

quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## BACKGROUND

21. CGI operates through various subsidiaries, including Quality Companies, LLC, Quality Equipment Leasing, LLC (the "Quality Companies") which together offer lease purchase programs for tractors, used trailer sales, and new equipment leasing for fleets.

22. In March of 2014, CGI entered into a transaction with non-CGI entity, Element Financial Corp. ("Element"), under which Element purchased CGI's portfolio of independent contractor leases (which included leasing a tractor from CGI through the Quality Companies) and directly provided financing to CGI's independent contractors. The portfolio was held in CGI's Quality Companies business unit.

23. Under CGI's agreement with Element, CGI was required to service the equipment lease and other financing arrangements between independent contractor drivers and Element, which includes collecting payments from the independent contractors and remitting those payments to Element.

24. The agreement also included an arrangement under which CGI was obligated to advance to Element any shortfall between the required lease payments and the maintenance advances and amounts actually collected from the independent contractors (the "Lease Shortfall Advances").

25. Element was obliged to reimburse CGI for the Lease Shortfall Advances when they disposed of the entire tranche of tractors to which the shortfall related.

26. In CGI's full year 2016 financial report, filed on Form 10-K with the SEC on September 13, 2016, the Company explained that the "demand for trucking services and the market for used tractors have both weakened" and that "[t]hese factors have depressed Quality's earnings and created negative cash flows associated with our obligation to advance certain amounts to [Element]." Put simply, CGI was hemhorraghing money as a result of its Lease Shortfall Advance obligations.

27. In the same 10-K filing, the Company announced that it had signed an MOU with Element "under which substantially all of Quality's tractors under management owned by such third party financing provider, 19th Capital [which in 2015 purchased a portfolio of the Quality Companies' independent contractor leases], and Quality would be combined into 19th Capital as a joint venture" (the "Joint Venture"). The Company further explained that existing agreements with Element would be terminated and replaced with definitive agreements contemplated by the MOU.

## SUBSTANTIVE ALLEGATIONS

### *A. Materially False And Misleading Statements Made During the Class Period*

28. The Class Period begins on January 27, 2016. On that day, CGI issued a press release, and filed the same the following day on Form 8-K with the SEC, entitled "Celadon Group Reports December Quarter Results and Declares Dividend," summarizing the Company's

financial and operating results for the period ended December 31, 2015. In part, CGI reported $49,298,000 in "Leased revenue equipment held for sale" and $81,016,000 in "Revenue equipment held for sale" under its "current assets."

29. On February 9, 2016 CGI filed with the SEC its quarterly report on Form 10-Q for the three month period ended December 31, 2015, providing the Company's consolidated financial results for that period summarized in the Company's January 27 press release, including that CGI's assets included $49,298,000 in "Leased revenue equipment held for sale" and $81,016,000 in "Revenue equipment held for sale," and further provided that:

> Gain on sale of revenue equipment increased from $4.0 million in second quarter of fiscal 2015 to $5.5 million in second quarter of fiscal 2016. This increase was due to increased equipment sales to third parties partially offset by constrained delivery of new replacement equipment and a weaker used tractor market. We expect gain on sale to remain consistent over the next six months. However, gain on sale can vary significantly due to a variety of factors, including our ability to grow our equipment leasing and services segment, availability of replacement equipment and conditions in the new and used equipment markets.

30. The Company's February 9, 2016 Form 10-Q also assured investors of the effectiveness of the Company's internal control over financial reporting:

> **Item 4. Controls and Procedures**
>
> **Evaluation of Disclosure Controls and Procedures**
>
> We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control

objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

31. The Company's February 9, 2016 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, who each certified:

1. I have reviewed this Form 10-Q of Celadon Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its

consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

32. On April 27, 2016, CGI issued a press release, and filed the same on Form 8-K with the SEC, entitled "Celadon Group Reports March Quarter Results and Declares Dividend," summarizing the Company's financial and operating results for the period ended March 31, 2016. In part, CGI reported $56,374,000 in "Leased revenue equipment held for sale" and $78,822,000 in "Revenue equipment held for sale" under its "current assets."

33. On May 10, 2016 CGI filed with the SEC its quarterly report on Form 10-Q for the three month period ended March 31, 2016, providing the Company's consolidated financial results for that period summarized in the Company's April 27, 2016 press release, including that CGI's assets included $56,374,000 in "Leased revenue equipment held for sale" and $78,822,000 in "Revenue equipment held for sale."

34. CGI's May 10, 2016 Form 10-Q also assured investors of the effectiveness of CGI's internal control over financial reporting.

35. CGI's May 10, 2016 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶31, supra.

36. On September 13, 2016, CGI filed with the SEC its annual report on Form 10-K for the fiscal year ended June 30, 2016, reporting, among other things, its assets and revenue associated with revenue equipment held for sale:

**CELADON GROUP, INC.**
**CONSOLIDATED BALANCE SHEETS**
**June 30, 2016 and 2015**
**(Dollars and shares in thousands except par value amounts)**

| **ASSETS** | **2016** | **2015** |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 9,077 | $ 24,699 |
| eceivables, net of allowance for doubtful accounts of $1,588 and $1,002 at June 30, 2016 and June 30, 2015, respectively | 134,572 | 130,892 |
| Prepaid expenses and other current assets | 38,498 | 33,267 |
| Tires in service | 3,175 | 1,857 |
| Leased revenue equipment held for sale | 24,937 | 52,591 |
| Revenue equipment held for sale | 44,876 | 49,856 |
| Income tax receivable | 473 | 17,926 |
| Total current assets | 255,608 | 311,088 |
| Property and equipment, net of accumulated depreciation and amortization of $142,423 and $147,446 at June 30, | 636,733 | 788,530 |

| | | |
|---|---|---|
| 2016 and June 30, 2015, respectively | | |
| Leased assets, net of accumulated depreciation and amortization of $9,717 at June 30, 2016 | 99,300 | --- |
| Tires in service | 3,603 | 2,173 |
| Goodwill | 62,451 | 55,357 |
| Investment in unconsolidated companies | 2,253 | --- |
| Other assets | 43,342 | 11,458 |
| Total assets | $1,103,290 | $1,168,606 |

**LIABILITIES AND STOCKHOLDERS' EQUITY**

| | | |
|---|---|---|
| Current liabilities: | | |
| Accounts payable | $ 26,499 | $ 13,699 |
| Accrued salaries and benefits | 17,090 | 16,329 |
| Accrued insurance and claims | 20,727 | 14,808 |
| Accrued fuel expense | 8,258 | 10,979 |
| Accrued purchase transportation | 22,046 | 16,259 |
| Accrued equipment purchases | --- | 775 |
| Deferred leasing revenue | 15,918 | 31,872 |
| Other accrued expenses | 29,560 | 31,835 |
| Current maturities of long-term debt | --- | 948 |
| Current maturities of capital lease obligations | 51,397 | 62,992 |
| Total current liabilities | 191,495 | 200,496 |
| Long term debt, net of current maturities | 152,032 | 133,199 |
| Capital lease obligations, net of current maturities | 247,383 | 366,452 |
| Other long term liabilities | 22,227 | 953 |
| Deferred income taxes | 109,138 | 101,163 |
| Stockholders' equity: | | |
| on stock, $0.033 par value, authorized 40,000 shares; issued and outstanding 28,715 and 28,342 shares at June 30, 2016 and 2015, respectively | 948 | 935 |
| y stock at cost; 500 shares at June 30, 2016 and 2015, respectively | (3,453) | (3,453) |
| nal paid-in capital | 198,576 | 195,682 |
| Retained earnings | 218,056 | 195,412 |
| Accumulated other comprehensive loss | (33,112) | (22,233) |
| Total stockholders' equity | 381,015 | 366,343 |
| Total liabilities and stockholders' equity | $1,103,290 | $1,168,606 |

**CELADON GROUP, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**Years ended June 30, 2016, 2015, and 2014**
**(Dollars in thousands)**

| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income | $ 24,844 | $ 37,217 | $ 30,681 |
| ustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 79,606 | 75,624 | 64,800 |
| Gain on disposition of equipment | (22,395) | (23,619) | (6,736) |
| Gain from sale of minority investment | --- | --- | (17,143) |
| Deferred income taxes | 8,259 | 32,391 | 5,210 |
| Provision for doubtful accounts | 825 | 240 | 100 |
| Stock based compensation expense | 2,855 | 2,772 | 2,077 |
| Changes in operating assets and liabilities: | | | |
| Trade receivables | 165 | (6,198) | (17,125) |
| Income tax receivable and payable | 17,589 | (11,426) | 7,905 |
| Tires in service | (2,771) | 860 | (1,917) |
| Prepaid expenses and other current assets | (5,461) | (4,538) | (10,409) |
| Other assets | (34,944) | 240 | 886 |
| Leased and revenue equipment held for sale | (60,707) | (85,331) | --- |
| Accounts payable and accrued expenses | (13,076) | 26,333 | 11,988 |
| Net cash provided by (used in) operating activities | (5,211) | 44,565 | 70,317 |
| Cash flows from investing activities: | | | |
| Purchase of property and equipment | (87,597) | (118,422) | (82,826) |
| Proceeds on sale of property and equipment | 143,688 | 172,354 | 103,926 |
| Proceeds from sale of minority interest | --- | --- | 21,000 |
| Investment in unconsolidated companies | (2,000) | --- | --- |
| Purchase of businesses, net of cash acquired | (18,264) | (114,682) | (36,602) |
| Net cash provided by (used in) investing activities | 35,827 | (60,750) | 5,498 |
| Cash flows from financing activities: | | | |
| Proceeds from issuance of common stock | 51 | 85,353 | 2,985 |
| Borrowings on long-term debt | 824,750 | 847,285 | 325,520 |
| Payments on long-term debt | (807,762) | (789,847) | (358,466) |
| Borrowings on other long-term liabilities | 29,980 | --- | --- |
| Payments on other long-term liabilities | (597) | --- | --- |
| Dividends paid | (2,200) | (1,873) | (1,837) |
| Principal payments on capital lease obligations | (90,638) | (113,624) | (29,190) |
| Net cash provided by (used in) financing activities | (46,416) | 27,294 | (60,988) |
| Effect of exchange rates on cash and cash | 178 | (1,918) | (634) |

| | | | | | | |
|---|---|---|---|---|---|---|
| equivalents | | | | | | |
| Increase (decrease) in cash and cash equivalents | | (15,622) | | 9,191 | | 14,193 |
| Cash and cash equivalents at beginning of year | | 24,699 | | 15,508 | | 1,315 |
| Cash and cash equivalents at end of year | $ | 9,077 | $ | 24,699 | $ | 15,508 |
| Supplemental disclosure of cash flow information: | | | | | | |
| Interest paid | $ | 13,794 | $ | 7,776 | $ | 4,802 |
| Income taxes paid | $ | 259 | $ | 5,627 | $ | 9,901 |
| Obligations incurred under capital leases | $ | 90,415 | $ | 304,261 | $ | --- |
| Conversion of capital leases to operating leases | $ | 130,440 | $ | --- | $ | --- |

****

*Leased revenue equipment held for sale*

Leased revenue equipment held for sale is recorded at the lower of carrying value and fair market value less costs to sell. Leased revenue equipment held for sale is depreciated during months the assets are under leases. The majority of the assets included in leased revenue equipment held for sale were acquired to be sold and those assets have been recorded at cost. Management has a plan to sell these leased assets in their current condition to third party financing parties and is currently marketing these units at a reasonable price compared to their fair value. The sale is probable within one year.

*Revenue equipment held for sale*

Revenue equipment held for sale is recorded at the lower of carrying value and fair market value less costs to sell. The Company also ceases the depreciation on these assets. The majority of the assets included in revenue equipment held for sale were acquired to be resold and those assets have been recorded at cost. As of June 30, 2016, 33% of the units held for sale was comprised of old Celadon fleet equipment no longer in service versus newly purchased equipment. Newly purchased equipment is defined as equipment purchased for the sole purpose of being leased to a third party fleet or an independent contractor and then sold to a third party financing company. The newly purchased equipment has not operated in Celadon's fleet. Management has a plan to sell these assets in their current condition to third party purchasers and is currently marketing these units at a reasonable price compared to their fair value. The sale is probable within one year.

****

We have recorded leased revenue equipment held for resale on our consolidated balance sheet of $24.9 million. These assets are current under lease with and independent contractor or fleet and our equipment leasing and services

segment has a plan to sell these leased assets in their current condition to a third party financing part and are currently marketing these units at a reasonable price compared to their fair value. The sale of these units is probable within one year.

We have recorded equipment held for resale of $44.9 million on our consolidated balance sheet. These units are not currently operating in the Celadon fleet, nor are they under a current lease with an independent contractor or fleet. Our equipment leasing and services segment plans to sell these assets in their current condition to a third party purchaser and is currently marketing these units at a reasonable price compared to their fair value. The sale is probable within one year.

****

Gain on sale of revenue equipment decreased from $23.6 million in fiscal 2015 to $22.4 million in fiscal 2016. We expect gain on sale to decrease as we shift the focus of our equipment leasing and services segment to a more recurring revenue stream and to focus on ancillary services rather than sales of leased equipment. As we shift to a more recurring revenue stream we expect to reduce the potentially volatile impact of gains from sales of leased tractors and trailer. However, gain on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets.

37. CGI's September 13, 2016 Form 10-K also assured investors of the effectiveness of CGI's internal control over financial reporting:

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2016, using criteria established in *Internal Control-Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In making this assessment management used the criteria set forth by COSO in *Internal Control—Integrated Framework (1992)*. As permitted by SEC guidance, management excluded from its assessment the operations of the A&S and Taylor acquisitions made during fiscal 2015, which are described in note 15 of the consolidated financial statements. The total assets of the entities acquired in these acquisition represents approximately 11.3% of the Company's total consolidated assets, net of goodwill, as of June 30, 2016. Based on this assessment, our management has concluded that as of June 30, 2016, our internal control over financial reporting is effective based on those criteria.

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.
>
> The effectiveness of our internal control over financial reporting as of June 30, 2016 has been audited by BKD LLP, an independent registered public accounting firm, as stated in their attestation report. See "Financial Statements and Supplementary Data" under Item 8 of this Annual Report on Form 10-K for BKD LLP's attestation report.
>
> **CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> The Company's management, including the Company's Chief Executive Officer and its Chief Financial Officer regularly review our disclosure controls and procedures and make changes intended to ensure the quality of our financial reporting. There were no changes in our internal control over financial reporting that occurred during the most recently completed fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

38. CGI's September 13, 2016 Form 10-K was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶31, supra.

39. On November 9, 2016, CGI filed with the SEC its quarterly report on Form 10-Q for the three month period ended September 30, 2016, providing the Company's consolidated financial results for that period, including that CGI's assets included $17,967,000 in "Leased revenue equipment held for sale" and $28,987,000 in "Revenue equipment held for sale." The Form 10-K explained further that:

> Gain on sale of revenue equipment decreased from $13.2 million in first quarter of fiscal 2016 to $1.3 million in first quarter of fiscal 2017. The decrease resulted from a cessation in sales of leases and underlying equipment by our equipment leasing and services segment, fewer dispositions from our fleet, and lower prices for dispositions due to a weak used equipment market. We expect gain on sale to remain generally consistent with the levels experienced in the first quarter of fiscal 2017 as we have shifted the focus of our equipment leasing and services

> segment to a more recurring revenue stream and to focus on ancillary services rather than leasing and sales of leases and underlying equipment. The shift to a more recurring revenue stream, is expected to reduce the potential volatile impact of gains on sale of leased tractors and trailers. However, gain on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets. While we have no plans for our equipment leasing and services segment to acquire additional assets to lease or sell any significant additional leases and the underlying equipment at this time, we will continue to evaluate opportunities as the market permits.

40. CGI's November 9, 2016 Form 10-Q also assured investors of the effectiveness of CGI's internal control over financial reporting.

41. CGI's November 9, 2016 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶31, supra.

42. On December 30, 2016, CGI issued a press release entitled "Celadon Group Announces Closing of Joint Venture with Element Fleet Management," in which CGI, among other things, touted its $100 million investment in its newly-created joint venture with Element. The press release stated, in pertinent part:

> INDIANAPOLIS, Dec. 30, 2016 /PRNewswire/ -- Celadon Group, Inc. (NYSE: CGI) ("Celadon") announced today that it has entered into a joint venture agreement with Element Transportation LLC ("Element"), a subsidiary of Element Fleet Management (TSX: EFN). The joint venture will hold leasing assets managed by Celadon's Quality Companies, LLC business unit ("Quality") and formerly held by a combination of Celadon (including, Element, and 19th Capital Group, LLC ("19th Capital"), a Delaware limited liability company.
>
> **Company Statement**
>
> Chairman and Chief Executive Officer Paul Will commented: "We are very pleased to announce the closing of our previously announced joint venture transaction with Element. Since August, we have been working diligently with the Element team to structure a high quality, well-capitalized business that will provide excellent transportation assets and high quality service to our customers. With the interests and investments of Element and Celadon strongly aligned, an experienced management team, and the resources to optimize leasing assets, the

joint venture has the components for success. The support and business acumen of the Element team were instrumental to the process, and we appreciate their partnership.

"In addition to capitalizing a strong joint venture, the transactions furthered Celadon's goals of exiting the capital intensive component of the leasing business, reducing balance sheet debt, and converting our Quality Companies unit primarily to an asset light business. We believe the transaction has multiple benefits for our stockholders and are excited to be able to focus our resources on the trucking side of the business."

"We have built a long-term relationship with Celadon, and we are excited to deepen our partnership," stated Bradley Nullmeyer, Chief Executive Officer of Element. "This joint venture expands Element's position in the Class 8 tractor sector and provides a great opportunity to broaden our range of fleet services across a larger market, with a great partner."

**About the Joint Venture**

The joint venture represents the combination of the former equipment leasing portfolios of Celadon, Element, and 19th Capital that were managed by Quality. The joint venture holds over 10,000 tractors for use in leasing operations, with a business plan focused on leasing to trucking fleets. The joint venture is considered to be one of the leading lessors to this market, with an augmented and experienced management team that is focused on driving excellence throughout the business.

The joint venture was formed through recapitalizing 19th Capital. The former owners of 19th Capital (including Celadon's former Class A and Class B interests) were redeemed using pre-transaction cash of 19th Capital, and new equity was contributed by Celadon and Element to establish the post-transaction capitalization. Celadon's contribution includes cash and lease equipment totaling $100 million in value in exchange for its equity in the joint venture. The cash component was more than offset by proceeds of redemption, settlement of the deferred purchase price on assets sold to 19th Capital in FY2016, and collection of an amount relating to the terminated pre-joint venture arrangements. After the contributions, each of Celadon and Element own approximately 49.99% of the joint venture's equity, with employees of 19th Capital holding the remainder.

As part of the transaction, all previous agreements between Celadon, Element, 19th Capital, and their respective affiliates, have been terminated or assumed by the joint venture with no liability of Celadon. Quality has entered into a new Service Agreement with the joint venture and will provide leasing management services in exchange for a monthly fee per tractor.

> **Additional Information**
>
> In addition to closing the joint venture, Celadon received approximately $50 million in cash proceeds from the sale of equipment associated with the Quality business at net book value for use by the joint venture. This sale and the equity contribution of equipment substantially reduced the Company's equipment held for sale, leased assets held for sale, and leased assets.
> The Company will file a Form 8-K containing additional information within the required timeframe.

43. On January 6, 2017, the Company filed a Form 8-K with the SEC further detailing the Joint Venture and its contributions thereto, including that the company had contributed a $31.8 million cash reimbursement of Lease Shortfall Advances received from Element, and had received $56.7 million from equipment sales, among other things:

> - The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used with a net book value of $63.6 million, and (iii) received credit for $1.1 million of unencumbered cash in the bank accounts of 19th Capital immediately at the consummation of the Transaction. In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital, (ii) paid to the Company $31.8 million in cash for reimbursement of previous payments made by the Company related to the Element assets, and (iii) issued the Company an obligation to distribute restricted cash of 19th Capital and its subsidiaries at the closing of the Transactions of approximately $2.5 million at such time as such cash becomes unrestricted. Going forward, the Company has agreed not to enter into additional leases as lessor in the equipment leasing business, subject to a modest exception for short-term leasing pending ordinary course dispositions from the Company's trucking fleet.

****

**Summary of Cash Sources and Uses**

The following table summarizes the Company's primary sources and uses of cash associated with the Transactions (excluding taxes, fees, and expenses):

| Source / (Use) (in millions) | Description |
| --- | --- |
| $ 4,600 | Cash received – redemption |
| 6,700 | Cash received – receipt of deferred purchase price cash |
| 50,000 | Cash received – sale of Quality equipment |
| 31,800 | Cash received – reimbursement of Other Assets |
| (35,300) | Cash invested in 19th Capital at closing |
| $ 57,800 | Net cash received at closing |

The foregoing excludes other sources and uses of cash during the quarter and should not be considered a substitute for the Company's net changes in cash during the quarter.

**Summary of Equipment Transactions**

The following table summarizes the Company's total contribution to 19th Capital at closing, including equipment dispositions associated with the Transactions:

| Source / (Use) (in millions) | Description |
| --- | --- |
| $ 56,000 | Equipment contributed to 19th Capital at closing |
| 21,900 | Contribution of deferred sale assets from 9/30/2016 |
| 50,000 | Equipment sold to Element at closing |
| 34,600 | Settlement of deferred sale assets from 6/30/2016 |
| $ 162,500 | Total equipment reduction at closing |
| | |
| $ 14,300 | Contribution of deferred sale liability from 9/30/2016 |
| 26,000 | Settlement of deferred sale liability from 6/30/2016 |
| $ 40,300 | Total reduction in liabilities at closing |
| | |
| $ 77,900 | Equipment contributed to 19th Capital at closing |
| (14,300) | Other liabilities related to contributed deferred sales assets |
| 35,300 | Cash contributed to 19th Capital |
| 1,100 | Undistributed cash remaining with 19th Capital |
| $ 100,000 | Total contribution to 19th Capital at closing |

44. On February 10, 2017, CGI filed with the SEC its Quarterly Report on Form 10-Q for the three month period ended December 31, 2016, providing the Company's consolidated financial results for the three month period ending December 31, 2016, including that CGI's assets included $4,201,000 in "Leased revenue equipment held for sale" and $0 in "Revenue equipment held for sale," and explaining that:

> Gain on sale of revenue equipment decreased from $5.5 million in second quarter of fiscal 2016 to $0.5 million in second quarter of fiscal 2017. This decrease was due to decreased equipment sales to third parties and a weaker used tractor market. We expect gain (loss) on sale with respect to revenue equipment to be relatively small for the balance of fiscal 2017. Gain (loss) on sale can vary significantly due to a variety of factors, including availability of replacement equipment and conditions in the new and used equipment markets. Other than in connection with equipment turnover in our trucking operations fleet, we have no plans for our equipment leasing and services segment to acquire additional assets to lease or sell any significant additional leases and the underlying equipment at this time.

45. CGI's February 10, 2017 Form 10-K also touted the Company's collection of $31.8 million in Lease Shortfall Advances from Element and, in-turn, contribution of that money to the Joint Venture:

> **Non-Controlling Investment**
>
> In December 2016, the Company, Quality Companies LLC, a wholly-owned subsidiary of the Company ("Quality"), Quality Equipment Leasing, LLC, a wholly-owned subsidiary of the Company ("Leasing"), 19th Capital Group, LLC, a non-controlling investment of the Company before and after the transactions described below ("19th Capital"), Element Transportation LLC ("Element"), and certain other parties entered into a series of simultaneous agreements and related transactions (collectively, the "Transactions"), pursuant to which substantially all tractors under management by Quality and owned by Element, 19th Capital, Quality, and Leasing have been combined into 19th Capital as a joint venture primarily between the Company and Element. After the Transactions, the Company and Element each own a non-controlling approximately 49.99% interest in 19th Capital, which at December 31, 2016, held the rights to over 10,000 tractors for use in leasing operations. The Company recorded $100.0 million as a minority investment and will record operating results of the joint venture using the equity method of accounting. The Transactions included the following:

- *Redemption of Existing Members*: 19th Capital redeemed all of its issued and outstanding membership interests, including those owned by the Company, for $15.7 million in cash. The Company's proceeds from the redemption were approximately $4.6 million in cash. The proceeds received relate primarily to the original $2.0 million that had been invested by the Company in 2015 and its proportionate share of undistributed earnings from inception. The Company recorded a net gain on the redemption of approximately $0.3 million, reflecting the excess of redemption proceeds over the initial investment plus equity income profits previously recognized. In addition to the redemption amount, the Company is entitled to receive approximately $2.5 million in restricted cash when the restrictions lapse. The Company has evaluated this receivable under ASC 450 – Contingencies and has not recorded a receivable within our financial statements at this time. If and when collected, this amount would be recorded as income.

- *Deferred Sale with 19th Capital*: As part of the Transactions the Company received proceeds of $6.7 million in payment of deferred purchase price from a sale of equipment to 19th Capital in the June 30, 2016 quarter. This collection triggered sales accounting treatment for leased assets where recognition of the sale was deferred and leased assets remained on the Company's balance sheet. As a result, the Company removed $34.6 million of "Leased assets" and $26.0 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". The Company did not recognize any gain or loss with this transaction.

- *Sale to Element*: The Company sold tractors and trailers and assigned the related leases to Element for approximately $50.0 million. There was no material gain or loss on the disposition of this equipment.

- ***Receipt of Lease Servicing Advance ("Perfect Pay")*: The Company received $31.8 million in cash related to a receivable from Element related to the Company's Perfect Pay obligations under the prior service agreements with Element.**

- *Contribution by the Company*: The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used, with a net book value of $56.0 million, (iii) received credit for $1.1 million of amounts owed to the Company by 19th Capital and (iv) contributed $7.6 million of the remaining consideration due from 19th Capital related to a September 30, 2016 deferred sale transaction with 19th Capital that was previously recorded as a financing transaction under GAAP. The contribution of the $7.6 million resulted in the removal of "Leased assets" of $21.9 million and $14.3 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". In consideration of the

foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital.

- *Summary of Transactions*: The following table summarizes the Company's total contribution to 19th Capital at closing (in thousands):

| Contribution | | Description |
|---|---|---|
| $ | 56,000 | Equipment contributed to 19th Capital at closing |
| | 7,600 | Contribution of deferred sale receivable |
| | 35,300 | Cash contributed to 19th Capital |
| | 1,100 | Receivable due from 19th Capital |
| $ | 100,000 | Total contribution to 19th Capital at closing |

****

**Cash Flows**

**Net cash provided by operations for the six months ended December 31, 2016 was $58.5 million, compared to $22.9 million for the six months ended December 31, 2015. The increase reflected several items related to the closing of our joint venture in December 2016 and related equipment transactions during the period. These items include, $31.8 million in collection of cash payment recorded under other assets**, distributions received on earnings from an unconsolidated entity of $2.6 million, and a $16.9 million reduction in leased revenue equipment held for sale. Excluding these amounts, net cash flow provided by operations was $7.2 million for the six months ended December 31, 2016. Leased revenue equipment held for sale reflects $82.1 million of sales less $65.2 million of purchases for the six months ended December 31, 2016. These purchases relate solely to equipment for the benefit of our equipment leasing and services segment which activities will be undertaken through 19th Capital moving forward. Leased revenue equipment held for sale was zero at December 31, 2016. Purchases and sales of used Celadon fleet equipment are included within our net cash provided by investing activities.

(Emphasis added).

46. CGI's February 10, 2017 Form 10-Q again assured investors of the effectiveness of CGI's internal control over financial reporting.

47. CGI's February 10, 2017 Form 10-Q was signed by Defendants Peavler and Will and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Peavler and Will, substantially similar to the certifications described in ¶31, supra.

***B. The Truth Begins To Emerge – Disclosures At The End Of The Class Period***

48. On April 5, 2017, the market research website *Seeking Alpha* published a detailed report authored by Prescience Point , alleging that the Company overstated its investment in the Joint Venture by $31.8 million, providing, in pertinent part:

> **CGI Lied RE Collecting on its $31.8m Shortfall Receivable. Is this the Smoking Gun that it's Falsifying its Financials?**
>
> Given that the Lease Shortfall Advances were a significant reason that cash flow had turned negative, investors were obviously concerned about these payments. CGI had highlighted that its JV arrangement would not require continued Lease Shortfall Advances.[3] 8-K from 01/06/2017: "The new Service Agreement does not contain any payment remitting, "Perfect Pay" or similar obligation"
>
> Furthermore, CGI prominently highlighted in its Q2'17 earnings release filed on 2/01/2017 that it collected $31.8m of prior Lease Shortfall Advances from Element. Unfortunately, based on information provided in the JV subscription agreement, it appears that **CGI never actually collected its Lease Shortfall Advances. CGI received a sham daylight loan from the JV:** In the subscription agreement, CGI disclosed that Element provided a "daylight loan" of $31.8m to the JV, the JV then gave the $31.8m to CGI, and then CGI paid the $31.8m back to the JV to pay off the outstanding contribution from Element. What essentially happened is Element gave CGI $31.8m and then CGI handed that $31.8m right back to Element (with the JV as an intermediary). The circular transaction created the illusion that CGI collected it Lease Shortfall Advances and made a $31.8m contribution to the JV, but this is just accounting gimmicks. No value was ever created or contributed to the JV.




> The specific details of the Lease Shortfall Advance and related daylight loans are detailed below.

**Element required to repay the Lease Shortfall Advances:** CGI was obligated to provide lease shortfall payments to Element on an ongoing basis. By the end of Q1'17, CGI had made $31.9m in payments to Element. These payments were capitalized (i.e. not expensed) on CGI balance sheet as "Lease Shortfall Advances" within Other Assets. In its Q1'17 10-Q, CGI noted that Element was obligated to reimburse it for these payments:

"The financing provider is required to reimburse us for these advances and, accordingly, **we have accounted for the related receivable under other assets** on our consolidated balance sheet, in the amount of **$31.9 million** as of September 30, 2016, and June 30, 2016."

**CGI claims it collected its Lease Shortfall Advances from Element:** In its 8-K filed on 1/6/2017, CGI claimed its $31.9m lease shortfall receivable had been almost completely reimbursed by Element as part of the JV closing:

**Net Cash Received from the JV Closing**

| *($ millions)* | Q2' 17 |
|---|---|
| Cash received – redemption | $4.6 |
| Cash received – receipt of deferred purchase price cash | $6.7 |
| Cash received – sale of Quality equipment | $50.0 |
| Cash received – reimbursement of Other Assets | $31.8 |
| Cash invested in JV at closing | ($35.3) |
| **Net cash received at closing** | **$57.8** |

Sources: CGI filings with the SEC

**As disclosed in the subscription agreement, Element loaned money to CGI:** We believe the JV subscription agreement indicates that no collection occurred. Specifically, the subscription agreement details that Element provides a $31.8m "daylight loan" to the JV (i.e. "the Company" below), and then the JV would give the $31.8m received from Element to CGI.

> *At the closing of the Element Investment,*
>
> *((i)) Element shall transfer, convey, and assign to the Company the Element Assets;*
>
> *(ii) Element shall make a loan to the Company in the principal amount of $31,800,000 (the "Element daylight loan"), which shall be evidenced by*

> *this Agreement, and the Company shall pay $31,800,000 to Celadon in respect of the Payment; (Subscription Agreement, 02/10/17)*

> **As also disclosed in the subscription agreement, CGI immediately paid back the loan to Element:** The subscription agreement further details that (1) CGI will transfer the cash to the JV (i.e. "the Company" below) and the JV would repay the loan from Element. Thus, CGI gave the cash it received from the daylight loan right back to Element at the JV closing. This, in our opinion, proves without a shadow of a doubt that CGI created a gimmick loan to fool investors into believing that it collected its outstanding Lease Shortfall Advances.
>
> *At the closing of the Celadon Investment,*
>
> *((i)) Celadon shall transfer, sell, and assign all of its interests in the Quality Assets to the Company;*
>
> *(ii) Celadon shall transfer $31,800,000 in cash to an account designated by the Company, and the Company shall repay the Element Daylight Loan in full; (Subscription Agreement, 02/10/17)*

(Emphasis in original).

49. The April 5, 2017 Prescience Point article also noted that CGI's financial statements indicate that the Company had overstated its revenue and profits from equipment sales:

> **Accounting Lever #2: Equipment Loss Concealed (TBV and Profits Inflated by $36m)?**
>
> In its 8-K filed on 1/6/2017, CGI disclosed it received $56.7m in cash from Quality equipment sold to Element and another party at the JV closing. The company claimed it sold the equipment at book value. However, CGI's financial statements indicate this equipment was actually sold at a $36.0m loss. Therefore, we believe CGI further inflated its Q2'17 TBV and profits by $36.0m by failing to account for this loss.
>
> **CGI claims it received $56.7m in cash from the sale of certain Quality equipment:** In its 8-K filed on 1/6/2017, CGI disclosed it received $57.8m in cash from the JV formation and related transactions. According to its disclosure, the company received $56.7m from Quality equipment sales (highlighted in the following table). In addition, CGI claimed it disposed of this equipment at a price close to book value:

***Equipment with net book value of approximately $162.5 million was disposed of*** *in connection with the Transactions. These assets were primarily recorded under equipment held for sale, leased assets held for sale, and leased assets.* ***The Company does not expect to record a significant gain or loss on disposition of this equipment.*** [6] *CGI disposed of a total of $162.5m of Quality equipment in connection with the JV. Of which, $56.7m was sold for cash, $63.6m was contributed to the JV and the remaining $42.4m was used as collateral to settle prior debts. (8-K filed on 1/6/2017)*

**Source and Use of Cash in Quality Equipment Sales**

| *($ millions)* | |
|---|---|
| Cash received – redemption | $4.6 |
| Cash received – receipt of deferred purchase price cash | $6.7 |
| Cash received – sale of Quality equipment | $50.0 |
| Cash received – reimbursement of Other Assets | $31.8 |
| Cash invested in 19th Capital at closing | ($35.3) |
| **Net cash received at closing** | **$57.8** |

Sources: CGI filings with the SEC

**CGI financial statements indicated it collected only $20.7m in cashrelated to the sale of equipment:** CGI discloses the purchase and sale of Quality equipment in the operating cash flow statement in "leased revenue equipment held for sale." [7] *Included in net cash provided by operating activities is the change in leased and revenue equipment held for sale. The change in the account is made up of the net purchases and sales of equipment purchased only for the benefit of our equipment leasing and services segment. Note: "equipment leasing and services segment" relates to Quality.* In its Q2'17 Cash Flow Statement, CGI recorded $20.7m of cash inflow related to its leased revenue equipment.

**Cash Flow From Leased Revenue Equipment Held For Sale**

| *($ millions)* | Q1' 17 | Q2' 17 |
|---|---|---|
| Leased revenue equipment | ($3.8) | $20.7 |

Sources: CGI 10-Q Cash Flow Statements Filed with the SEC

**CGI appears to have overstated the value of assets sold - TBV should have been $36.0m lower:** Based on CGI's Q2'17 Cash Flow Statement, it appears that the company only collected $20.7m in cash related from the sale of equipment in Q2'17. Accordingly, we believe the sale price of Quality equipment was overstated by $36.0m.

**Loss On The Sale of Leased Revenue Equipment**

| *($ millions)* | Subscription Agreement | Prescient Point Estimates | Overstatement / (Understatement) |
|---|---|---|---|
| Cash received – redemption | $4.6 | $4.6 | $0.0 |
| Cash received – receipt of deferred purchase price cash | $6.7 | -- | -- |
| Cash received – sale of Quality equipment | $50.0 | -- | -- |
| Cash received for the sale of Quality Equipment | $56.7 | $20.7 | $36.0 |
| Cash received – reimbursement of Other Assets | $31.8 | $31.8 | $0.0 |
| Cash invested in JV at closing | ($35.3) | ($35.3) | $0.0 |
| Net cash received at closing | $57.8 | $21.8 | $36.0 |

*Prescience Point Estimates

Sources: CGI filings with the SEC

50. On April 19, 2017, Prescience Point published another article, entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," which reported that the research group was denied information about CGI sought under the Freedom of Information Act ("FOIA") due to an ongoing SEC investigation. The report provided, in pertinent part:

> **CGI is Being Investigated by the SEC Enforcement Division**
>
> We received data in response to our Freedom of Information Act ("FOIA") requests that confirms CGI is the subject of an active SEC investigation. CGI has failed to disclose these proceedings.
>
> In a letter dated March 3, 2017, the FOIA office denied our request for access to CGI's investigative records by invoking Exemption (b)(7)(A) of the FOIA. Citation of the (b)(7)(A) exemption means that the SEC deems the release of information it has collected on CGI could be expected to interfere with law enforcement proceedings.
>
> - An excerpt from the first page of the FOIA office's response letter is provided below:

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
STATION PLACE
100 F STREET, NE
WASHINGTON, DC 20549-2465

Office of FOIA Services

March 3, 2017

[redacted]

Re: Freedom of Information Act (FOIA), 5 U.S.C. § 552
Request No. 17-01684-FOIA

Dear [redacted]

This letter is in response to your request, dated January 31, 2017 and received in this office on February 8, 2017, for access to the main investigative file for Celadon Group, Inc., since January 1, 2013. Specifically, you listed six types of records for which you were interested, as well as information regarding confidential treatment requests.

We are withholding records that may be responsive to your request under 5 U.S.C. § 552(b)(7)(A), 17 CFR § 200.80(b)(7)(i). This exemption protects from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities. Since Exemption 7(A) protects the records from disclosure, we have not determined if other exemptions apply. Therefore, we reserve the right to assert other exemptions when Exemption 7(A) no longer applies.

- Again, by invoking Exemption (b)(7)(A), the SEC has acknowledged that CGI is the subject of an ongoing SEC investigation. Per the Department of Justice,

  > *The first subpart of Exemption 7 of the Freedom of Information Act, Exemption 7, authorizes the withholding of 'records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings.'*

- For further confirmation of the existence of an investigation, we sent an administrative appeal to the General Counsel's office. In its response, the General Counsel's office denied our access to CGI's records by once again invoking Exemption (b)(7)(A), stating that releasing investigative records on CGI could "interfere with ongoing enforcement proceedings." By doing so, the General Counsel's office has confirmed that CGI is the subject of an active SEC investigation. An excerpt from the first page of the General Counsel's response letter is provided below:

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

Stop 9612

March 13, 2017

[redacted]

Re: Appeal, Freedom of Information Act Request No. 17-01684-FOIA, designated on appeal as No. 17-00271-APPS

Dear [redacted]

This responds to your Freedom of Information Act (FOIA) appeal of the FOIA Officer's denial of your January 31, 2017 FOIA request for certain investigative records concerning Celadon Group, Inc. that the Commission has obtained or generated since January 1, 2013. By letter dated March 3, 2017, the FOIA Officer denied your request pursuant to FOIA Exemption (b)(7)(A). On March 9, 2017, you filed this appeal challenging the FOIA Officer's invocation of Exemption 7(A). I have considered your appeal and it is denied.

I have determined that the FOIA Officer correctly asserted Exemption 7(A).[1] There is a two-step test to determine whether information is protected under Exemption 7(A), whether: (1) a law enforcement proceeding is pending or prospective, and (2) release of information about it could reasonably be expected to cause some articulable harm.[2] We have confirmed with staff that releasing the withheld information could reasonably be expected to interfere with ongoing enforcement proceedings.[3]

---

51. On May 1, 2017, after trading had closed, CGI issued a press release entitled "Celadon Group Announces Corporate Updates" and filed the same on Form 8-K with the SEC, providing, among other things, that the Company's auditor, BKD, LLP had withdrawn its reports on the Company's June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company relating to "transactions involving revenue equipment held for sale" and that those financial statements should no longer be relied upon:

> **Item 4.02 Non-Reliance on Previously Issued Statements or a Related Audit Report or Completed Interim Review.**
>
> (a) and (b) On April 25, 2017, BKD, LLP ("BKD"), the independent auditors for the Company, informed the chair of the Audit Committee of the Company's Board of Directors (the "Audit Committee") that it was withdrawing its reports on the June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon. BKD advised the Company that additional information relating to transactions involving revenue equipment held for sale had come to BKD's attention subsequent to BKD's issuance of its audit report on the Company's June

30, 2016 financial statements and after the issuance of BKD's review reports on the Company's September 30, 2016 and December 31, 2016 interim financial statements. BKD further advised the Company that, in accordance with PCAOB Auditing Standard 2905, BKD had performed procedures to evaluate this information, including requesting explanations and supporting documentation from the Company's management. Based on the results of BKD's procedures, BKD advised the Company that BKD has been unable to obtain sufficient appropriate audit evidence to provide a reasonable basis to support its previously issued reports for the periods indicated above. As a result, as of May 1, 2017, the Audit Committee has concluded that the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016, and related reports of BKD, should not be relied upon.

The Audit Committee has discussed with BKD the matters disclosed under this Item 4.02. Based on these discussions, the Company understands the following: (i) BKD has not resigned as the Company's auditor; (ii) BKD has determined that it has not obtained sufficient appropriate audit evidence with respect to the revenue equipment held for sale transactions to determine that those transactions were properly recorded in accordance with GAAP; and (iii) BKD is prepared to review additional information, if any, and adjustments to the Company's financial statements, if any, and to then consider whether to re-issue the withdrawn reports.

The insufficient appropriate audit evidence relates to the accounting (and related structure, substance, and disclosure) of transactions involving dispositions and acquisitions of revenue equipment between June and December of 2016 and the related carrying values. Additional information concerning the transactions and the fair values of the revenue equipment disposed of and acquired is required to determine the appropriateness of the accounting for these transactions. The need for additional information followed an Audit Committee request of BKD to perform additional procedures on the transactions prior to the normal audit cycle for fiscal 2017.

The Company has provided BKD a copy of this Form 8-K and requested BKD to furnish a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made in Item 4.02 of this Form 8-K, and, if not, stating the respects in which it does not agree. The Company has requested that BKD provide such letter as soon as possible, so that the Company can file such letter as an Exhibit to this Current Report on an amended Form 8-K within the time period prescribed by the Securities and Exchange Commission.

52. The Company's May 1, 2017 press release and subsequently filed Form 8-K also announced that CGI's President and Chief Operating Officer ("COO), William Eric Meek, had resigned.

## **CLASS ACTION ALLEGATIONS**

53. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired CGI securities between January 27, 2016 through May 2, 2017, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

54. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CGI securities were actively traded on the NASDAQ stock exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. As of November 14, 2016, the Company had 170,450,763 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by CGI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether the Exchange Act was violated by Defendants;

b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e. Whether the price of the Company's stock was artificially inflated; and

f. The extent of damage sustained by Class members and the appropriate measure of damages.

56. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

57. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

58. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

59. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

60. During the Class Period, Plaintiff and the Class purchased CGI securities at artificially inflated prices and were damaged thereby.

61. On April 5, 2017, a report published on the investor website *Seeking Alpha* entitled "Celadon Group: A Story that Ends At Chapter 11," detailed the "smoking gun" showing that CGI had falsified its financial statements and represented to shareholders that its investment in the Joint Venture was $100 million when, in fact, it was only $68.2 million due to a sham "daylight loan" the Company counted as a cash contribution to the Joint Venture.

62. On this news, shares of CGI fell from $6.25, the closing price on April 4, 2017, to close at $5.40 on April 5, 2017, representing a 13.63% decline in the value of the Company's common stock.

63. This decline is directly attributable to the April 5, 2017 article published by Prescience Point and featured on *Seeking Alpha* entitled "Celadon Group: A Story that Ends At Chapter 11," which detailed that a sham loan was counted by CGI, and reported to shareholders, as a capital contribution to the Joint Venture.

64. On April 19, 2017, the same prominent market research group published another report entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," which reported that the research group was denied information about CGI sought pursuant to the FOIA due to an ongoing SEC investigation.

65. On this news, CGI's share price fell CGI fell from $4.40, the closing price on April 18, 2017, to $4.20 per share on April 19, 2017, representing a 4.5% decline in the value of the Company's common stock.

66. This decline is directly attributable to the April 19, 2017 article published by Prescience Point and featured on *Seeking Alpha* entitled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," claiming that the SEC is actively investigating CGI.

67. On May 1, after trading had closed, CGI disclosed that its auditor had withdrawn its reports for the Company's financial statements for fiscal year 2016 (ended June 30, 2016) and the quarters ended September 30, 2016 and December 31, 2016, and that those financial statements should no longer be relied upon, and, additionally, that the Company's President and COO had resigned.

68. On this On this news, CGI's share price fell CGI fell from $4.00, the closing price on May 1, 2017, to $1.80 per share on May 2, 2017, representing a 55% decline in the value of the Company's common stock.

69. This decline is directly attributable to the May 1, 2017 disclosure that the Company's financial statements should no longer be relied upon and that its President and COO had resigned.

**FRAUD ON THE MARKET**

70. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

71. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news ire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

72. The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

73. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CAUSES OF ACTION

## COUNT I

**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

74. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

75. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

77. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### (Against The Individual Defendants)

78. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

79. The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false or misleading

both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

80. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

81. As set forth above, CGI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B. awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C. awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D. awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: May 16, 2017

**GARDY & NOTIS, LLP**

By: /s/ Jennifer Sarnelli
James S. Notis
Jennifer Sarnelli
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508
jnotis@gardylaw.com
jsarnelli@gardylaw.com

**BLOCK & LEVITON LLP**
Jeffrey C. Block
Jacob A. Walker
Bradley J. Vettraino
155 Federal Street, Suite 400
Boston, MA 02110
Tel: 617-398-5600
Fax: 617-507-6020
Jeff@blockesq.com
Bradley@blockesq.com

*Counsel for Plaintiff*